W. L. GORE & ASSOCIATES, INC., Appellant in No. 75–1162,

v.

CARLISLE CORPORATION, Appellant in No. 75–1163.

Nos. 75–1162, 75–1163.

United States Court of Appeals, Third Circuit.

Argued Oct. 3, 1975.

Decided Jan. 23, 1976.

Marcus B. Finnegan, Finnegan, Henderson, Farabow & Garrett, Washington, D. C., for W. L. Gore & Associates.

W. Philip Churchill, Fish & Neave, New York City, for Carlisle Corp.

Before MARIS, VAN DUSEN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

MARIS, Circuit Judge.

These are appeals by both the plaintiff and the defendant from a judgment of the District Court for the District of Delaware. The judgment was entered in a civil action brought by the plaintiff, W. L. Gore & Associates, Inc., against the defendant, Carlisle Corporation. The plaintiff's amended complaint alleged that the plaintiff was the owner of Patents Nos. 3,082,292 (herein '292), originally issued to R. W. Gore, and 3,540,956 (herein '956), originally issued to H. W. Arnold and W. L. Gore, and that the defendant had been and was infringing each of the patents without license and in violation of the plaintiff's rights. The amended complaint sought an injunction and treble damages by reason of deliberate and willful infringement. The defendant's amended answer denied that the plaintiff's patents were valid, asserted that Patent '292 was unenforceable because of fraud in its procurement and that Patent '956 was not infringed and, by way of counterclaim, sought damages for the plaintiff's alleged violation of sections 1 and 2 of the Sherman Act. After a trial of the issues of validity, including procurement fraud, infringement and Sherman Act violation, the district court entered a judgment holding Patent '292 valid and infringed and Patent '956 invalid and determining that the plaintiff was guilty of a misuse of the patents which also involved a violation of section 2 of the Sherman Act. The judgment granted an injunction restraining the defendant from infringing Pat-

ent '292 and stayed pending appeal all further proceedings for an accounting for the infringement of Patent '292 and for determining the damages incurred through the antitrust violation. From this judgment each party has appealed.

We consider preliminarily our jurisdiction to entertain these appeals. The plaintiff asserts that its appeal is brought under 28 U.S.C. § 1291 which authorizes appeals from final judgments. However, since the judgment under appeal merely adjudicated the issues of validity, infringement and antitrust violation and postponed until later the accounting for the infringement and the determination of damages for the antitrust violation, it was definitely interlocutory in character and not a final judgment which was appealable under § 1291. *Latta v. Kilbourn*, 150 U.S. 524, 539–540, 14 S.Ct. 201, 37 L.Ed. 1169 (1893). We must, therefore, determine whether it was appealable as an interlocutory judgment.

Interlocutory judgments from which appeals are permitted are limited to those specified in 28 U.S.C. § 1292. Subsection (a)(4) of that section confers jurisdiction to review "Judgments in civil actions for patent infringement which are final except for accounting." So far as the plaintiff's claim for patent infringement is concerned, the judgment here appealed from is final except as to the accounting required by reason of the finding of infringement. But the action also includes the defendant's counterclaim for antitrust violation. If that counterclaim had been fully and finally adjudicated by the judgment appealed from, the latter doubtless would have been a judgment which was final except for an accounting, within the meaning of § 1292(a)(4). See *McCullough v. Kammerer Corp.*, 331 U.S. 96, 67 S.Ct. 1165, 91 L.Ed. 1365 (1947). On the other hand, if the patent claims had been fully and finally determined by the judgment under appeal except for the accounting for infringement, but the antitrust claim had been wholly reserved for later determination the judgment would not be appealable under § 1292(a)(4). For in such a situation the judgment would not have been final as to all the issues and claims in suit except for the accounting. *American Cyanamid Co. v. Lincoln Laboratories, Inc.*, 403 F.2d 486 (7th Cir. 1968); *Ronel Corp. v. Anchor Lock of Florida, Inc.*, 312 F.2d 207 (5th Cir. 1963).

Clearly the present case does not fall within the first of the two classes just discussed. Nor does it fall squarely within the second, for here the merits of the antitrust counterclaim have been adjudicated by the judgment appealed from while it is only the amount of the resulting damages, the remaining issue in the claim, which has been deferred for future determination. However, this deferred determination of damages was not a deferred accounting within the meaning of § 1292(a)(4) since the exception in that subsection refers to an accounting in the type of action to which the subsection applies, namely, a patent infringement case, not to the assessment of damages in a separate non-patent cause of action which has been included in or added to the patent infringement action under the liberal joinder and counterclaim provisions of the Federal Rules of Civil Procedure. Hence the judgment appealed from was not final "except for accounting" as the subsection requires. We conclude, therefore, that the judgment does not fall within § 1292(a)(4). Consequently, that subsection does not confer jurisdiction of these appeals.

Subsection (a)(1) of § 1292 confers jurisdiction upon the courts of appeals of

> "Interlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;"

When, as in the patent infringement case now before us, an injunction against future infringement is sought and is either granted or refused in the judgment determining the issues of va-

lidity and infringement, the portion of that judgment granting or denying the injunction becomes appealable under § 1292(a)(1) as an interlocutory order. *General Electric Co. v. Marvel Rare Metals Co.*, 287 U.S. 430, 433, 53 S.Ct. 202, 77 L.Ed. 408 (1932); *Smith v. Vulcan Iron Works*, 165 U.S. 518, 17 S.Ct. 407, 41 L.Ed. 810 (1897). And since the propriety of granting or denying the injunction normally depends upon the correctness of the district court's determination of the underlying issues of validity and infringement, so much of the judgment as determined those issues is necessarily reviewable on such an appeal. *Devex Corp. v. Houdaille Industries, Inc.*, 382 F.2d 17, 20 (7th Cir. 1967); *Hook v. Hook & Ackerman, Inc.*, 233 F.2d 180, 182 (3d Cir. 1956), *cert. denied*, 352 U.S. 960, 77 S.Ct. 350, 1 L.Ed.2d 325 (1957); *Loew's Drive-In Theatres, Inc. v. Park-In Theatres, Inc.*, 174 F.2d 547, 550 (1st Cir.), *cert. denied*, 338 U.S. 822, 70 S.Ct. 68, 94 L.Ed. 499 (1949). In such a situation, however, the jurisdiction conferred upon the court of appeals does not extend to other claims or issues determined by the judgment which have no bearing upon the propriety of the action of the court with respect to the injunction. *Ex parte National Enameling & Stamping Co.*, 201 U.S. 156, 26 S.Ct. 404, 50 L.Ed. 707 (1906); *Loew's Drive-In Theatres, Inc. v. Park-In Theatres, Inc.*, 174 F.2d 547, 550 (1st Cir.), *cert. denied*, 338 U.S. 822, 70 S.Ct. 68, 94 L.Ed. 499 (1949); *Caterpillar Tractor Co. v. International Harvester Co.*, 120 F.2d 82, 86 (3d Cir. 1941); *Sheldon v. Moredall Realty Corp.*, 95 F.2d 48, 49 (2d Cir. 1938). Our decision in *Kohn v. American Metal Climax, Inc.*, 3d Cir., 458 F.2d 255, 262, *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972) is not to the contrary. For in that case an injunction was the principal relief sought and all the issues decided by the district court in its interlocutory judgment which was appealed under § 1292(a)(1) appear to have been involved in the plaintiff's right to injunctive relief.

We conclude that we have jurisdiction to review the issues of patent validity and infringement raised by the plaintiff's amended complaint and adjudicated by the interlocutory judgment under appeal. But since the issues of anti-trust violation raised by the defendant's counterclaim involve a wholly independent cause of action and do not bear upon the plaintiff's right to injunctive relief, we do not reach them on these interlocutory appeals. Those issues will be reviewable, however, upon appeal from the final judgment in the case, if one is taken, or from a final judgment on the counterclaim alone if such a judgment is entered under Rule 54(b).

We turn then to consider the validity of the two patents in controversy.

Patent '292, issued March 19, 1963 to R. W. Gore, discloses a process for manufacturing flat multiconductor ribbon cable using unsintered polytetrafluoroethylene (herein PTFE) in sheet form as the insulating coating material enclosing the conductor wires. One of the plastics known by the trade name Teflon, PTFE is durable, tough and highly resistant to heat and corrosive elements. It is initially produced in powder form. The powder has a crystalline structure which may be converted into an amorphous state by heating it to a temperature above 621° F. In such a state the PTFE is not fibrillated. A material such as PTFE may be sintered, that is, caused to become a coherent solid, by heating without thoroughly melting it. Sheets of unsintered PTFE are produced commercially by extruding from the narrow barrel of a ram extruder paste-like pellets of PTFE powder mixed with a lubricating agent. The pellets are forced through the long, flat, narrow exit opening of the extruder, the opening being of the dimensions of the sheets to be extruded. The extrusion under pressure creates fibers in the PTFE particles of the paste, the fibrillation causing the material to hold together after extrusion in sheet form. This fibrillation is an inherent characteristic of unsintered PTFE in the form of sheets produced by extrusion.

The process of Patent '292 involves pressing tightly together or calendering

between two unheated pressure rolls two unsintered sheets of PTFE, the conductor wires having been inserted between them, followed by free sintering to fully bond the assembly. Before sintering, however, the product comprising the two calendered sheets containing the conductor wires is flexible and cohesive, the sheets having no tendency to separate upon handling. After sintering the sealed sheets remain strong and are homogenous. The patent process supplied an unsatisfied need in the industry and met with immediate commercial success. The district court held the patent valid, finding its process to be unobvious, adequately disclosed in the specification and claims and not anticipated by the prior art.

The district court's finding is challenged by the defendant which urges in this court that a necessary element of the Gore process, the use of sheets of PTFE which have been produced by extrusion, is not disclosed in the patent specification and that the patent is, therefore, invalid for failure accurately and precisely to claim the invention. It appears that unsintered PTFE material which is not fibrillated will not firmly adhere to other similar PTFE material, even under pressure, without sintering. However, sheets of PTFE produced by extrusion will firmly bond together under pressure without heat. This is because the particles of PTFE in the extruded sheets are fibrillated and sheared by the process of extrusion in which condition, as we have seen, they will bond under pressure with the particles in another sheet. This is the Gore discovery which is disclosed by Patent '292. And that it was an unexpected and quite unobvious discovery is attested by the fact, as the district court found on ample evidence, that the opinion at the time of the invention of scientists concerned with the use of PTFE was to the contrary, the prevailing view teaching away from the Gore discovery. We are satisfied that the district court did not err in finding the invention of Patent '292 nonobvious. *United States v. Adams*, 383

U.S. 39, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

It is true, as the defendant points out, that Patent '292 does not specify that the sheets of PTFE to be employed in the patented process must have been produced by extrusion. Therefore, urges the defendant, the patent is invalid for failure to claim this essential element. The district court found, however, that PTFE sheets manufactured by extrusion were the only unsintered PTFE sheets which were commercially available at the time of the invention and that such extruded sheets were, therefore, necessarily called for by the references in the patent specifications and claims to PTFE in sheet form. With this finding we agree.

Finally, the defendant asserts that the invention of Patent '292 was anticipated by the Richards Patent No. 2,731,068, issued January 17, 1956. That patent covers a laminated insulating material useful as slot liners in electric motors. Richards impregnates a fiber glass substrate with a mat of PTFE dispersion powder, then calenders and free sinters a double or triple thickness of the impregnated material. Richards' effort is to produce a laminate of a material impregnated with PTFE useful as a slot liner, the substrate being of solid structure having its own qualities of strength, durability and heat-resistance. Richards is concerned with the effect of calendering followed by sintering of his laminated material. He does not teach that the layers of his material will be firmly bonded together after calendering and before sintering. On the contrary, his specification admits that "when the plies are rolled or pressed together at room temperature, the polymeric material does not adhere to itself as tenaciously as it does if the pressure is applied with a slightly elevated temperature, and it is therefore necessary to exercise greater care in handling the material to prevent the plies from becoming separated." And again, "care must be exercised in handling the coherent compacted plies before the fusing operation since they

are not firmly bonded at this stage." Patent '292 on the other hand teaches that the unsintered sheets of PTFE which it employs may be pressed together by being passed through the bite of two unheated rolls and that the web thus formed appears homogenous and shows no tendency to separate during handling prior to sintering. "An unexpected discovery," says Patent '292, "is that these unsintered sheets of polytetrafluoroethylene adhere together very tightly when they are compressed in the bite of the rolls . . ." It is the discovery of this capacity of the unsintered PTFE sheets used in the Gore process to adhere tightly upon cold rolling, a capacity resulting from the fibrillated character of the PTFE in the extruded sheets-form employed in the process, which is the essence of Gore's invention and distinguishes it from the prior art. The district court did not err in so concluding.

As we have indicated, the defendant asserted in its defense in the district court that Patent '292 was unenforceable because of fraud in its procurement. The district court rejected this contention, however, and the defendant does not press it on appeal. We, therefore, need not consider it. Likewise, we need not consider the question of infringement, since the district court found infringement and the defendant has not questioned that finding on appeal.

■ We conclude that the district court did not err in holding Patent '292 valid, enforceable and infringed by the defendant.

Patent '956 was issued to H. W. Arnold and W. L. Gore on November 17, 1970. It covers an improvement on the '292 patent having the objective of precisely positioning electrical conductors as they are encapsulated in an insulating tape, the distance between the conductors remaining constant along the length of the tape. The district court held that the '956 patent is invalid in view of the prior art and because the invention was obvious to one skilled in the art.

The process of the '956 patent provides for more exact alignment of conductor wires in an insulating tape by adding to the '292 apparatus a third beaded or ridged roll which cooperates with one of the two calendering rolls of the '292 invention to form grooves in one sheet of the insulating material into which the conductor wires are placed before its entry with the second insulating sheet into the nip of the two calendering rolls to form the final product. The pregrooving of the insulating sheet decreases the amount of lateral flow of the insulating material around and over the wires which ordinarily occurs when pressure is exerted on the assembly to cause the insulating sheets to adhere to each other. With the reduction of the lateral flow, the individual wires retain their position in the finished tape and do not sideslip. The process was designed to meet the stringent tolerances for wire spacing in multiconductor cable required by IBM for use in its System 360 computor.

The district court found that it has long been recognized in the art that grooved rolls can be utilized to place a series of conductors in one of two corrugated (i. e. pregrooved) strips of material and then that the strips could be united by pressure to embed the wires. Thus the McTighe Patent 246,407, issued August 30, 1881, discloses the placing of insulated wires into the grooves of corrugated strips of lead before subjecting two such oppositely disposed strips to lamination through the pressure of smooth calendering rolls. The Ackerman Patent 894,790, issued July 28, 1908, discloses the pregrooving of a plastic insulator and a wrapper material by passing both between aligned beaded and grooved rolls before they are fed into the nip of the calendering rolls for lamination. The conductor wires are fed from tension rolls into the circular apertures formed by the oppositely disposed inner grooves in the two plastic insulators as they enter the nip of the calendering rolls.

In the '956 invention the conductor wires are fed into the preformed grooves

of one sheet of the insulating material just before the sheet reaches the nip of the calendering rolls. This differs from Ackerman's feeding of the conductor wires into the preformed grooves of the insulating material directly at the nip of the two calendering rolls. The patent states that with the wires thus positioned in the grooves before going through the nip of the calendering rolls they stay in place, not moving to one side or the other, and the pulling action of the nip on the assembly has no adverse effects. It appears, however, that the same result is achieved by the Ackerman process of feeding the wires from tension rolls into the preformed grooves directly at the nip of the calendering rolls.

As we have seen, Patent '956 involves merely an improvement on the process of Patent '292. It deals with the problem of more precisely positioning multiple conductor wires in a multiconductor tape manufactured by that process. Under the process of Patent '292 in which the conductor wires are fed into the nip of the calendering rolls between the two flat surfaced insulating sheets to form the tape, the wires on being pressed into the sheets by the rolls cause a lateral displacement of the material of the sheets which may result in some lateral shifting of the alignment of the wires. Under the process of Patent '956, however, as well as under that disclosed by the Ackerman patent, most of the displacement of the insulating material of the sheets takes place at the time when they are grooved by the pressure of the fixed ridges on the grooving rolls against one of the calendering rolls, resulting in the formation of precisely aligned grooves in the sheets into which the conductor wires are later fed. In that process the preformed grooves receive and hold the wires in alignment and since the wires largely occupy the open space provided by the grooves very little additional displacement of the insulating material takes place during passage through the bite of the calendering rolls. As a result, the conductor wires lying in the grooves remain, during and after

that operation, as precisely aligned as were the grooves into which they had been fed.

It is thus clear that it is the pregrooving of the insulating material and not the exact point at which the conductor wires are fed into the grooves, which is significant in the process of Patent '956. And, as we have seen, this precise pregrooving process was disclosed by the Ackerman patent. While the prevention of the lateral shifting of the conductor wires may not have been the purpose of the Ackerman invention, the discovery of a new use for an old process does not constitute patentable invention. *General Electric Co. v. Jewel Incandescent Lamp Co.*, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945); *Allen-Bradley Co. v. Air Reduction Co.*, 273 F.Supp. 930, 940 (W.D.Pa. 1967), *aff'd* 391 F.2d 282 (3d Cir. 1968).

We have considered the other prior art patents which the defendant argues anticipated the process of the '956 patent and which the district court discussed in its opinion. However, in view of the clear anticipation of that process by the McTighe and Ackerman patents, we need not discuss them further here.

The plaintiff asserts that its '956 invention satisfied a need which had been felt for several years for precise conductor alignment in multiconductor cables and that the immediate commercial success of the '956 invention is evidence that such a need existed. The plaintiff, however, does not dispute the fact that the inventors, H. W. Arnold and W. L. Gore, conceived the idea of the '956 invention within a few days after IBM notified the plaintiff that the wire spacing of its 60-conductor cable was not sufficiently uniform to meet its requirements. In addition, the invention's commercial success was the subject of some dispute. These questions the district court did not resolve, however, since it found the patent invalid.

■ Long-felt need and commercial success are secondary considerations which may become factors in the determination of patent validity only when the decision as to obviousness is a close

one. *Graham v. John Deere Co.,* 383 U.S. 1, 35–36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). This is not such a case, however, since we are satisfied that the invention should have been obvious to one skilled in the art in view of the disclosures of the prior art. We conclude that the district court did not err in holding Patent '956 invalid.

As we have seen, the district court found that the defendant was guilty of infringing the claims of Patent '292 which are in suit and that finding is not contested on appeal. But the defendant asserted in the district court that the plaintiff had misused the patent and was, therefore, not entitled to enforce it against the defendant. The court found that there had been such misuse during the period from September 26, 1972 to January 8, 1973. In this court the defendant urges that it was error for the district court to hold that the misuse ended on January 8, 1973, while the plaintiff argues that the court erred in finding any misuse at all.

■ As has been pointed out, our appellate jurisdiction is limited to the review of that part of the district court's judgment which is relevant to its grant of an injunction against infringement by the defendant. The plaintiff's right to that injunction followed from the determination of the court that the misuse, which it found had begun in September, 1972, was terminated by January 8, 1973. If the court had decided that the misuse had not ceased, as the defendant contends, an injunction against infringement would doubtless have been denied. The question of patent misuse is, therefore, relevant to the issuance of the injunction against the defendant. Accordingly, we have jurisdiction to review the determination of the district court with respect to that issue.

■ The doctrine of patent misuse is an extension of the equitable doctrine which denies judicial relief to one who comes into court with "unclean hands." The courts will not aid a patent holder who has abused his patent privilege to recover any emoluments accruing during the period of misuse. *United States Gypsum Co. v. National Gypsum Co.,* 352 U.S. 457, 465, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957). Where a patent has been used in violation of the antitrust laws, the holder cannot then restrain infringement of the patent by others. *Hartford-Empire Co. v. United States,* 323 U.S. 386, 418–419, 65 S.Ct. 373, 89 L.Ed. 322 (1945). And even if an antitrust violation has not been proved, as where it is not shown that use of the patent substantially lessened competition or tended to create a monopoly, the courts will not protect a patent monopoly which is being used to restrain competition contrary to the policy of the antitrust laws. *Morton Salt Co. v. G. S. Suppiger Co.,* 314 U.S. 488, 492–493, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Moreover, misuse may be a violation of the public policy embodied in the patent law itself. *Report of the Attorney General's National Committee to Study the Antitrust Laws* at 231–232 (1955). Thus an attempt to extend a patent monopoly beyond the patent claims or the limited period of the monopoly grant necessarily runs counter to the patent laws under which but a limited monopoly privilege is granted and then only when certain conditions have been met.

■ The defendant's claim that the plaintiff misused its '292 patent is predicated on two grounds. The defendant first urges that the plaintiff's demand for an unreasonably high royalty in consideration of its grant to the defendant of a license to use the patents was motivated by a desire to force the defendant to increase its price of PTFE cable. The defendant states that an accession to this demand would have resulted in either an unlawful price-fixing conspiracy between the plaintiff and defendant or would have permitted the plaintiff to price the defendant out of the market. The district court, we think rightly, rejected this ground for finding misuse of the patent.

■ The defendant's speculation as to the plaintiff's motives in offering a license at what the defendant considered

an exorbitant price, 30% of the defendant's gross sales of the patented product, we regard as irrelevant. The general rule is that, absent any overriding unlawful conduct, "A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly." *Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964); *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 445 F.2d 84, 95 (7th Cir. 1971); *Carter-Wallace, Inc. v. United States,* 449 F.2d 1374, 1383, 196 Ct.Cl. 35 (1971). A royalty demand which is so high as to preclude acceptance of a license offer is, after all, not appreciably different from a refusal to license upon any terms. The right to refuse to license is the essence of the patent holder's right under the patent law which rewards invention disclosure by the grant of a limited monopoly in the exploitation of the invention. Moreover, even if a demand for "unreasonable" royalties should be regarded as a misuse of the patent, the evidence in this case does not establish that the receipt of 30% of the defendant's sales of the patented product would have netted the plaintiff earnings greater than it would have realized had it manufactured and sold the PTFE cable itself. The royalty demand was, therefore, not clearly unreasonable on any theory.

The defendant's second ground of alleged misuse is that the plaintiff attempted to coerce it to accept a license to use the patent and to discontinue its defense against the validity of the patents it was charged with infringing. The defendant asserts that a statement by the plaintiff that it would consider discontinuing its conductor wire purchases from the defendant's International Wire Division and its bringing of an infringement suit against one of the defendant's customers, AP Products Incorporated, were coercive means of accomplishing its objectives which constituted a misuse of its patent.

 While crediting the plaintiff with a good faith belief that its patents were valid, the district court, neverthe-

less, characterized its statement that it might discontinue its purchases of wire from the defendant as a threat made to persuade the defendant to end its infringing manufacture and sale of PTFE cable, to terminate its challenge to the validity of the patents and to accept a license securing for the plaintiff a royalty on the defendant's sales of PTFE cable. These findings are not clearly erroneous. But the court went on to hold that this threat was an attempt by the plaintiff to use its purchasing power in the conductor wire market to gain an unfair advantage in the sale of PTFE cable and constituted an attempt by it to engage in unlawful reciprocal dealing. The court further held that the plaintiff evidenced an intent to monopolize by indicating its intention to use its patent monopoly power to the fullest extent. The court also found that there was a dangerous probability that the plaintiff would succeed in its monopolizing attempt by reason of its existing strength in the PTFE cable market combined with the "substantial" risk that the defendant would succumb to the plaintiff's threat leaving it dominant in the PTFE cable market, which comprises 40 to 60% of the conductor cable market. Thus, the court held, the plaintiff was guilty of an attempt to monopolize that market, a violation of section 2 of the Sherman Act and a misuse of the patent. In reaching these conclusions the district court erred.

The statement by the plaintiff that it would consider looking elsewhere for its conductor wire needs, amounting to between $600,000 and $700,000 yearly, which presently were being met by the defendant was made at a settlement meeting held on September 26, 1972. Settlement negotiations had been entered into by the parties, at the request of the defendant, after the filing of the infringement suit. Two meetings were held, the September 26th meeting being the second. At that second meeting the plaintiff offered the defendant an exclusive license under its patents in exchange for the payment by it of a 30%

royalty on sales covered by the patent claims. The plaintiff also proposed at the meeting that the infringement suit be discontinued and that the defendant pay it a 30% royalty on all of its sales covered by the patents from the dates of issuance of the patents. The defendant rejected this offer to license and made a counteroffer proposing a royalty rate of 30% on its first $200,000 of sales, the rate to be gradually reduced as sales increased down to a rate of 5% on its sales over $1,000,000. The plaintiff refused the counteroffer on November 16, 1972 and on January 8, 1973 formally withdrew its earlier license offers. It was the latter action which the district court held terminated the plaintiff's misuse of its patents.

■■■■ We do not agree that the plaintiff's statement that it would consider looking elsewhere for its supply of conductor wire constituted a misuse of its patents. We recognize, of course, that the use of substantial purchasing power in one product market to coerce a supplier into a reciprocating purchase in another market may be an illegal restraint of trade if the user's purchasing power is sufficiently substantial and its use results in substantial foreclosure of competition in the other weaker product market. *FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 595, 600, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965). Likewise, we recognize that a patent holder may not extend his monopoly by attempting to tie in the sale of unpatented articles for use with his patented products. *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). We do not think, however, that these principles are applicable here. An effort by a patent holder to defend his valid patent monopoly by exercising the right which he has in common with all others to do business with whom he pleases [1] cannot rationally be regarded as a misuse of his patent. It surely cannot be the law that a patent holder must continue to do business with a wilful infringer, thereby possibly contributing financially to the ability of the latter to defend against and possibly defeat his infringement suit. To hold otherwise would be to require a plaintiff to assist the defendant in its defense against the assertion of the plaintiff's valid patent claim.

■■■ Where such a statement is made in the context of settlement negotiations in which the patent holder has also offered the infringer a license by which to legalize his infringing activities and assure the patent holder the royalties to which he is entitled under the patent, the patent has not been misused. And where, in addition, one of the patent holder's proposed terms of settlement is the termination of the infringement suit, there is no patent misuse. Essentially, the purpose of settlement negotiations is the termination of the suit involved. There is, therefore, little significance to be attached to its inclusion as an express term of the settlement by either of the parties. A patent is presumptively valid. 35 U.S.C. § 282. The present infringement suit was initiated by the plaintiff under the good faith belief, as the district court found, that its patents were valid, which belief proved well-founded in the case of Patent '292. Moreover, the plaintiff was undoubtedly aware of the probability of a defense of invalidity. The defendant was the party who initiated the settlement overtures. As licensee, the defendant would have retained the legal power to challenge the validity of the licensed patent under *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). Under the circumstances here present, we see no justification for reading into the statement concerning the plaintiff's wire purchases an improper desire to avoid a challenge to patent validity.[2]

1. *See United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

2. This would be a different and more difficult case if we concluded, which we do not, that the plaintiff attempted to use its buying power in the wire market improperly to foreclose a challenge to the validity of its patents.

We conclude that the statement made by the plaintiff to the defendant in the course of their settlement negotiations that it might consider finding another supplier than the defendant for its conductor wire was not an improper use of its patent.

■ We consider finally the defendant's contention that the bringing of an infringement suit against one of the defendant's customers was an unfair use of the patent. However, it is clear that an infringement suit brought in good faith does not constitute patent misuse and a patent holder's right to bring such a suit without being deemed guilty of patent misuse is expressly provided for in the Act, 35 U.S.C. § 271. The fact that the plaintiff brought suit against a customer of the defendant is a natural consequence of the latter's infringing activities and does not suggest conduct coercive of the defendant either by itself or taken together with the plaintiff's other acts which we have discussed above.

■ Neither the plaintiff's isolated acts nor the totality of them in the context in which they arose provide a basis for finding patent misuse. A patent holder must be circumspect in the uses to which he will put his patent, for the patent grant is a privilege which runs counter to the general policy of the law. On the other hand, he is not to be unduly circumscribed or penalized for the skill or fortuitous circumstance which enables him under the law to enjoy the monopoly which the grant of the patent has given him.

So much of the judgment appealed from will be reversed as adjudges the plaintiff guilty of patent misuse during the period from September 26, 1972 to January 8, 1973 and directs an accounting for damages incurred through patent misuse by the plaintiff during that period and an award of attorneys' fees relative thereto. So much of the judgment as adjudges Patent 3,082,292 valid and infringed, as directs an accounting for such infringement and as adjudges Patent 3,540,956 invalid, is affirmed, and the cause is remanded for further proceedings not inconsistent with this opinion.