**UNITED STATES of America, Cross-appellant in No. 87–1777,**

v.

**Marcus SPEARS and Doris E. Spears.**

**Appeal of Doris SPEARS, in No. 87–1735.**

**Nos. 87–1735, 87–1777.**

United States Court of Appeals, Third Circuit.

Argued July 11, 1988.

Decided Oct. 13, 1988.

---

Jeffrey L. Greenwald, (argued), Lehigh Valley Legal Services, Inc., Easton, Pa., for Marcus and Doris Spears.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, James G. Sheehan, (argued), Asst. U.S. Atty., Philadelphia, Pa., for the U.S.

Before SLOVITER, SCIRICA, and WEIS, Circuit Judges.

1. After her divorce, defendant resumed her family name, Rivera. She will be referred to as Ms.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Pennsylvania statutes require that notice be given to a mortgagor before foreclosure proceedings may begin. The question on this appeal is whether a federal agency must comply with those statutes before foreclosing on a mortgage acquired in the course of a federal loan program. No-third party commercial interests are affected, and so we find no compelling reason to incorporate state law as the rule of decision. Accordingly, we will vacate a district court order directing the agency to comply with the state statutes.

In 1981, defendant Doris Spears (now Doris Rivera)[1] and her husband Marcus Spears (now deceased) purchased property located in Alburtis, Pennsylvania. The purchase was financed by a mortgage in the amount of $43,500 given by the Spears to the Farmers Home Administration (FmHA). Because of their modest income, the Spears received an "interest credit" subsidy from the FmHA, reducing the monthly payments from $487 to $130. Payments were made until June 1982, but none has been received since that time.

In July 1982, as the result of a marital dispute, the couple separated. Mr. Spears moved to New York and Ms. Rivera moved to Puerto Rico, expecting, she said, to be gone for three or four months. While in Puerto Rico, Ms. Rivera underwent treatment for various physical ailments and severe depression. She secured a consensual divorce in December 1982.

On October 14, 1982, the FmHA wrote to Ms. Rivera in Puerto Rico, stating that "[i]t has come to our attention that you have vacated your property. This is a violation of your mortgage agreement.... Your interest credit has also been cancelled and payments increased...." She was advised that she could either sell the property or refinance the mortgage and pay the government in full. A corresponding communication was mailed to Mr. Spears. Letters to the same effect were also sent to

Rivera in the course of the opinion.

both parties on January 18, 1983. In July 1983 Ms. Rivera left Puerto Rico and moved to her daughter's residence in Allentown, Pennsylvania.

In a letter dated March 16, 1984, the FmHA informed Ms. Rivera that default on the mortgage had occurred because of failures to make payments and to occupy the premises. The agency stated its intent to accelerate the loan and to begin foreclosure proceedings within thirty days. Once again Ms. Rivera was told that she could cure the default by making specified payments, transferring the property to another person in accordance with agency regulations, or refinancing the mortgage. The letter also gave notice of the right to an administrative hearing if she submitted a request within thirty days. The record contains no response by Ms. Rivera to any of these letters. Ms. Rivera moved back into the house in November 1985, and she has lived there since that time without paying any installment on the mortgage.

Foreclosure proceedings in the district court began in the summer of 1985. After disposing of some preliminary matters, the district court, with the consent of the parties, remanded the case to the FmHA for administrative determinations. Following a hearing and an appeal to the state director, the FmHA determined that the property had been abandoned in July 1982 and had remained so until December 1985. Consequently, the agency decided to continue with foreclosure.

The case then returned to the district court. On review, the court found that substantial evidence supported the administrative decision on abandonment and that the agency, therefore, had properly denied relief to Ms. Rivera. The district judge, however, upheld the defendant's contention that the FmHA was required to comply with two Pennsylvania statutes—Act 6 of 1974, 41 Pa.Stat.Ann. § 401–08 (Purdon 1988), and Act 91 of 1983, 35 Pa.Stat.Ann. § 1680.401c (Purdon 1988). These statutes direct that a mortgagor be given written notice of a mortgagee's intention to begin foreclosure proceedings at least thirty days in advance. In addition, the mortgagor must be provided a list of consumer credit counseling agencies and be notified of the right to apply for financial assistance from the state's Homeowner Emergency Mortgage Program.

The district court observed that these statutes neither afforded additional substantive benefits to FmHA mortgagors nor imposed a substantial administrative burden on the government. State law did not interfere with, or frustrate the objectives of, the federal program, and there was no need for uniform administration on a national basis. Relying on *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the court again remanded to the FmHA, directing it to "comply with the provisions of Act 6 and Act 91, after which the [government's] motion for summary judgment may be renewed." Both parties' motions for summary judgment were denied in the same order.

On appeal Ms. Rivera contends that the district judge erred in finding that the FmHA had produced substantial evidence to justify its abrogation of the financing arrangements. In its cross-appeal, the FmHA asserts that it is not required to comply with the state statutes which restrict a mortgagee's remedies against its mortgagor.

I.

A.

Ms. Rivera cites 28 U.S.C. § 1291 as the basis for appellate jurisdiction because, she contends, her appeal is taken from a final order. Although the FmHA has not contested that statement, it is clear that the order lacks finality in the traditional sense.

■ The summary judgment motions of both Ms. Rivera and the FmHA were denied, and the case was remanded to the agency. The denial of a summary judgment motion is not a final order, *Boeing Co. v. International Union, United Auto., Aerospace & Agric. Implement Workers of America*, 370 F.2d 969, 970 (3d Cir.1967).

■ Moreover, an order remanding a matter to an administrative agency is no

more than an interlocutory step in adjudicative proceedings and is generally not appealable. *United Steelworkers of America, Local 1913 v. Union R.R.*, 648 F.2d 905, 909 (3d Cir.1981); *Marshall v. Celebrezze*, 351 F.2d 467, 468 (3d Cir.1965). An exception exists, however, to the nonappealability of such remand orders. In *AJA Assoc. v. Army Corps of Engineers*, 817 F.2d 1070, 1073 (3d Cir.1987), we stated that proposition as follows: "when a district court finally resolves an important legal issue in reviewing an administrative agency action and denial of appellate review before remand to the agency would foreclose appellate review as a practical matter, the remand order is immediately appealable." *See also Horizons Int'l, Inc. v. Baldrige*, 811 F.2d 154 (3d Cir.1987); *Union R.R.*, 648 F.2d 905.

█ The remand order here falls within the special exception articulated in our cases. If the FmHA complies with the district court's order—giving the requisite state notification and then proceeding to foreclosure—the issue will become moot. On the other hand, if the agency declines to follow Pennsylvania law, the district court's directive will prevent the foreclosure action from proceeding, and the case will remain in limbo.

Moreover, the FmHA raises an issue that is significant in the day-to-day operation of the agency and has spawned conflicting district court decisions within this circuit. *See, e.g., United States v. Black*, 622 F.Supp. 669 (W.D.Pa.1985); *United States v. Royer*, 683 F.Supp. 484 (M.D.Pa.1986), *aff'd*, 815 F.2d 696 (3d Cir.1987). Finally, the question before us is purely one of law; the remand to the agency is not for the purpose of securing additional factual information. In these circumstances, we conclude that the district court's order directing the FmHA to comply with Pennsylvania Acts 6 and 91 is appealable.

**B.**

█ Ms. Rivera's appeal of the denial of her motion for summary judgment, however, presents separate jurisdictional problems. As noted above, such orders usually are not appealable, but here factors of reality and practicality must be evaluated.

We have the benefit of the district court's ruling that substantial evidence supports the agency's decision to deny Ms. Rivera's request to continue the mortgage in force. Our reading of the district court opinion leaves no doubt that, if the FmHA complies with Acts 6 and 91, summary judgment will be entered in its favor. A remand to the district court at this juncture would result in yet another appeal to this court raising precisely the same contentions now before us. We would then be encouraging, rather than discouraging, piecemeal appeals were we to decline review of Ms. Rivera's contentions now.

We recognize the strictures on appellate jurisdiction, but are mindful of a fairly well-defined, but narrow exception. In *San Filippo v. United States Trust Co.*, 737 F.2d 246, 254–55 (2d Cir.1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985), the court explained the doctrine of pendent appellate jurisdiction. "[O]nce we have taken jurisdiction over one issue in a case, we may, in our discretion, consider otherwise nonappealable issues in the case as well, where there is sufficient overlap in the facts relevant to [the appealable and nonappealable] issues to warrant our exercising plenary authority over [the] appeal." *Id.* at 255. *See also Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986); *Consolidation Coal Co. v. Local 1702, United Mineworkers of America*, 683 F.2d 827, 831 (4th Cir.1982); *Intermedics Infusaid, Inc. v. Regents of University of Minnesota*, 804 F.2d 129, 134 (Fed.Cir. 1986).

This exception, it must be emphasized, is an exercise of discretion by a Court of Appeals and should be used sparingly. Casual application might lead to abuse. For example, as a device to obtain review of a matter not otherwise within our jurisdiction, a litigant might bring us inconsequential issues that normally would not be appealed. *See* 16 C. Wright, A. Miller & E. Cooper, & E. Gressman, *Federal Practice and Procedure* § 3937 (1976 & 1987 Supp.). That danger, however, clearly is not posed

here where the cross-appeal gives us jurisdiction.

Although this Court has not expressly acknowledged that review of collateral matters may fall within our pendent jurisdiction, we have in fact ruled on such questions. In *Horizons Int'l*, the Court considered in the appeal an issue collateral to the administrative order. *See* 811 F.2d at 170. Similarly, in *AJA Associates*, where we had taken jurisdiction over a remand order, the panel remanded several contentions on the merits for "reasons of institutional integrity"—in short, to allow the district court to pass on the factual matters in the first instance. The panel gave a strong indication that it was not impressed with the appellant's argument on the merits, suggesting that "AJA's remaining arguments may also be meritless and resolution of the case on a motion for summary judgment may be appropriate." *AJA Assoc.*, 817 F.2d at 1074.

The present situation may be distinguished from that in *Kershner v. Mazurkiewicz*, 670 F.2d 440 (3d Cir.1982), where we limited the scope of an appeal under 28 U.S.C. § 1292(a) to issues intertwined with the preliminary injunction itself. There, we construed a statute that purported to grant only a limited exception "to the long-established policy against piecemeal appeals." *Id.* at 446–47.

The differences between *Kershner* and the one at hand are pertinent. In the preliminary injunction context, one expects that the case will be remanded to the district court to resolve the application for a permanent injunction. Thus, opportunity for appellate review of all issues will be provided ultimately. In addition, as we noted in *Kershner*, premature appellate review of an interlocutory order could disrupt the functioning of the district court by taking matters out of the judge's hands before the occasion for a ruling arose.

Neither of those circumstances is present here. Instead, the situation is more akin to that in *Johnson v. Alldredge*, 488 F.2d 820

(3d Cir.1973), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974), where on a section 1292(b) appeal we considered issues beyond those subsumed in the question of law certified to us.

To summarize, Ms. Rivera appeals from a matter on which the district court has ruled. The nature of the litigation is such that, upon compliance with our mandate, the district court has already indicated that it will enter summary judgment without further ado; Ms. Rivera will again appeal raising precisely the same issues now before us. Finally, it seems unlikely that any other issues will be appealed because, when the matters presently before us are resolved, the foreclosure action will proceed pro forma. Phrased differently, resolution of the issues at this point ends the battle, and little will remain except to tie up the loose ends. In these circumstances, considerations of judicial economy, the litigant's interests, and practicality demand that we exercise jurisdiction over the Rivera appeal.

## II.

The Pennsylvania statutes which the district court directed the FmHA to observe are known as Acts 6 and 91. Act 6 requires thirty days notice before accelerating the maturity of a residential mortgage or commencing foreclosure proceedings. Parenthetically we note that the notice given by the FmHA here appears to cover substantially the items listed in the state statute. Furthermore, Act 6 provides that the notice "shall not be required where the residential mortgage debtor[] has abandoned ... the property." 41 Pa.Stat.Ann. § 403(d) (Purdon Supp.1988). As a consequence, it is questionable whether notice was mandated by this Act in any event. Act 91 demands notification to the mortgagor and grants time to apply 'to a state agency for financial assistance before foreclosure may proceed.[2]

The FmHA loan to the Spears and the execution of a mortgage as collateral for

---

**2.** In its brief, the government asserts that the state agency will not process applications by federal debtors. If so, Ms. Rivera seemingly would not be eligible for assistance under the state act.

the debt is a contractual arrangement subject to federal law. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Although a transaction is governed by federal law, the rule of decision in some circumstances is derived from incorporation of relevant state law. *Kimbell Foods*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711; *United States v. Walter Dunlap & Sons, Inc.*, 800 F.2d 1232 (3d Cir.1986). However, before deciding whether, as a matter of federal law, state law should supply the rule of decision, we first examine the terms of the contract to determine if the agency had agreed to comply with state procedures.

Condition 17 of the mortgage provides that "should default occur "the Government, at its option, with or without notice, may: ... declare the entire amount unpaid under the note ... due and payable ... [or] foreclose this instrument as provided herein or by law...."

Paragraph 21 reads, "[t]his instrument shall be subject to the present regulations of the Farmers Home Administration, and to its future regulations not inconsistent with express provisions hereof."

In paragraph 23, the borrower agrees that upon default "the Government may foreclose this instrument as authorized or permitted by the laws then existing of the jurisdiction where the property is situated and of the United States of America, on terms and conditions satisfactory to the Government, including but not limited to foreclosure by (a) statutory power of sale, or (b) advertisement and sale of the property at public auction to the highest bidder in one or more parcels at the Government's option and at the time and place and in the manner and after such notice and on terms required by statute or determined by the Government if not contrary to statute."

The district court pointed to an FmHA regulation, 7 C.F.R. § 1955.15 (1986), setting out the forms to be used in giving notice of acceleration of accounts. The regulation stated that "[a] State Supple-

ment may be issued if the [Office of the General Counsel] advises different or additional language or format is required to comply with State laws or if notice and mailing instructions are different from that outlined in this paragraph." [3] *Id.* § 1995.15(d)(2).

A fair reading of the mortgage documents reveals that the FmHA "may" utilize state foreclosure procedures. Significantly, the contractual language does not state that the agency "must" or "will" do so. Paragraph 17, as noted above, provides that the government "may" foreclose "as provided herein or by law." The mortgage documents permit the FmHA to proceed in foreclosure proceedings either in state court or, as here, in a federal forum. In sum, no contractual clause binds the government to utilize state law in foreclosure.

Having determined that the choice of law is not dictated by contract terms, we must shift our analysis to the applicable rule of decision. Whether to adopt state law or to fashion a uniform federal rule rests on judicial policy drawn from the nature of the specific governmental interest at stake and the effect of applying state law. The court must ascertain if the federal program, by its nature, demands a single standard nationwide, whether application of state law would frustrate specific objectives of the federal program, and the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. *Kimbell Foods*, 440 U.S. at 728–29, 99 S.Ct. at 1458–59.

In both *Kimbell Foods* and *Walter Dunlap*, the aggrieved parties were not participants in the federal program. They would have been prejudiced by a federal rule preempting the state system of lien priorities of general applicability—statutes "on which private creditors base their daily commercial transactions." *Kimbell Foods*, 440 U.S. at 729, 99 S.Ct. at 1459. Noting that businesses look to state commercial law in evaluating risks of financial transac-

---

**3.** This refers to paragraph 23. That provision arguably might require the FmHA, if it used state procedures, to comply with such prerequi-

sites as Acts 6 and 91. The crucial fact here, however, is that the FmHA used federal, not state, procedures.

tions, the Court observed that "[c]reditors who justifiably rely on state law to obtain superior liens would have their expectations thwarted whenever a federal contractual security interest suddenly appeared and took precedence." *Id.* at 739, 99 S.Ct. at 1464.

In contrast, when the controversy does not affect third parties but embroils only the United States and a debtor, the factors that favor applying state law are considerably weakened if not removed entirely from consideration. This result is illustrated in *West Virginia v. United States,* 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), where the federal government sued a state on an indebtedness. The issue before the Supreme Court was whether the United States was entitled to prejudgment interest. The Court held that federal law governed the payment of interest due for delayed payment of a contractual obligation. "While there are instances in which state law may be adopted as the federal rule of decision ... this case presents no compelling reason for doing so.... [A]pplication of a federal rule would not 'disrupt commercial relationships predicated on state law' ... since state law would not of its own force govern contracts between a state and the Federal Government." *West Virginia,* 479 U.S. at 309, 107 S.Ct. at 705.

In the appeal here, it is significant that the mortgagees seek to enforce state procedural, rather than substantive, law. The FmHA regulations provide adequate notice and opportunity for hearing, and, consequently, due process considerations do not dictate the choice. *See* 42 U.S.C. §§ 1475, 1480(g), (k) (1982 & Supp. IV 1986); 7 C.F.R. § 1955.15 (1986). *Cf. Johnson v. United States Dep't of Agric.,* 734 F.2d 774 (11th Cir.1984).

The record establishes that a letter dated January 18, 1983 was sent by the FmHA to the Spears notifying them that because they had violated the terms of their mortgage, failure to take curative action within twenty days would result in foreclosure. The agency, however, did not begin foreclosure at that time.

More than one year later, by letter dated March 16, 1984, the FmHA again called attention to the default and advised the Spears of the agency's intention to accelerate the loan and foreclose on the mortgage. Proceedings were to be instituted within thirty days unless the delinquency was corrected. The letter also explained that the marshal would sell the property in approximately sixty days, but that the debtors could contact the FmHA within thirty days if they wished to schedule a hearing. Once again, the FmHA did not act as promptly as it had warned.

Foreclosure was not begun until 1985, and only after service of a complaint did Ms. Rivera request a hearing. The record demonstrates that she received notice on more than one occasion and had an ample opportunity for a hearing. Due process was observed, and there was no need to resort to the state notification statutes.

Other factors discussed in *Kimbell Foods* and *West Virginia* lead us to conclude that state law should not supply the rule of decision here. It is true that the contractual arrangements giving the FmHA an option to utilize state procedures conclusively demonstrate that no need for national uniformity is present. Nor can we say that application of state law would always frustrate the aims of the federal program. The fact that the FmHA has the contractual alternative to employ state procedures suggests that their use may be compatible with the federal scheme, at least in some circumstances. Efficient operation of the federal program conceivably could be improved through the FmHA's decision to utilize state law. For example, although not authorized by Pennsylvania law, sale by the mortgagee in the event of default without the delay and expense of foreclosure is permissible in some states. *See Johnson,* 734 F.2d at 777.

In *Kimbell Foods* and *Walter Dunlap* the critical factor counselling application of state law was the threat to commercial relationships founded on expectations of third parties relying on existing state statutes. In those cases, lien priorities had been established by an intricate network of

state laws regulating commercial activities in which federal programs were intruding. Federal interests would not suffer, and private businesses would benefit, by accommodating state law. On balance, therefore, it was preferable in both instances to utilize that law as the rule of decision.

Those considerations do not drive the choice here because third party interests are not affected, nor are private business practices threatened or impaired. A state interest in ensuring clear title to real estate is not at stake because the notification requirements at issue do not affect recordation of deeds after a federal foreclosure. A purchase of property at FmHA foreclosure in federal court does not create a cloud on the title.

From the standpoint of mortgagors in general, no overriding benefit flows from insistence on state procedures. FmHA regulations prescribe notification substantially equivalent to that mandated by state law. Indeed, in operation the FmHA administrative regulations and procedures appear to offer mortgagors greater protection than the state statutes. The moratorium provisions of the federal program and the allowance for so-called "interest credit subsidies" do not appear any less favorable than the state refinancing scheme.

Ms. Rivera's counsel's thorough familiarity with the state program illustrates the shortcoming of a rote requirement of notification about the state program. Ms. Rivera has been represented by Neighborhood Legal Services since 1985, but has never applied for participation in the state program. One may assume that her inaction stems from a likelihood of ineligibility. In an individual case, notification of that which is already known—and which would be of no utility in any event—is not a circumstance which would justify an exception to general provisions of law. Adherence to non-productive procedures that only result in additional expense and delay fails to support grafting state procedures on to a federal program.

Because no commercial interests or third parties are affected by the utilization of federal procedures, the rationale of the *Kimbell–Dunlap* analysis is not controlling. As in *West Virginia*, "this case presents no compelling reason for [adoption of state law]." *West Virginia*, 479 U.S. at 309, 107 S.Ct. at 705. Accordingly, the FmHA should be permitted to carry out its task of servicing mortgages under the procedures it selects.

In summary, we hold that the FmHA need not comply with Acts 6 and 91 whenever it chooses to utilize the federal court to foreclose on a mortgage in Pennsylvania.

### III.

Neighborhood Legal Services represented Ms. Rivera in the proceedings before an FmHA hearing officer. There she asserted her eligibility for a moratorium on past payments and a continuation of the interest credit. From an adverse decision by the hearing officer she appealed to the state director, who affirmed the decision.

FmHA regulations require that a borrower must "personally occupy the dwelling" to receive "interest credit." 7 C.F.R. § 1944.34(f) (1986). In addition, to secure a moratorium during which scheduled payments are deferred, "[t]he borrower must occupy the dwelling." 7 C.F.R. § 1951.313(b)(2) (1986). The district court assumed that no violation would occur if the homeowner took an extended vacation for three or four months or was hospitalized for a lengthy period. Nevertheless, the court found substantial evidence to support the agency finding that the Spears had abandoned the premises in July 1982 with no intent to return.

Ms. Rivera conceded, according to the district court, that Mr. Spears' departure was permanent, but she asserted that her intention was to stay away only for several months. Nonetheless, she did not respond to any of the FmHA's notifications in 1983 or 1984 other than to express a willingness to reconvey the premises to the government. She did not make any payments which would indicate continued interest in the property; nor did she take any steps for maintenance, such as arranging to heat

the house in the years after her departure. In Puerto Rico she lived in a home titled in her name and that of her former husband, a circumstance which is consistent with an intention to remain there.

Ms. Rivera asserts that she contacted the FmHA in July or September 1983 and in January 1984. The record contains a notation by an FmHA employee of a telephone conversation in January 1984. At that time Ms. Rivera said she was contemplating moving back into the house, but stated she could not pay the debt, which had grown to more than $50,000. She agreed that it would be better to reconvey the property to the government and proposed to visit the FmHA office whenever requested to sign the papers.

█ Our standard of review, as well as that of the district court, is limited. If the record contains substantial evidence to uphold the agency's factual finding, we may not disturb it, even were we inclined to find otherwise on a de novo hearing. *See Monsour Med. Center v. Heckler,* 806 F.2d 1185, 1190–91 (3d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 2481, 96 L.Ed.2d 373 (1987). In light of Ms. Rivera's expressed willingness on two occasions to convey the property to the government, her failure to arrange for any payments, and her absence for more than a year before making inquiry about returning, we cannot say that the agency's determination of abandonment lacks substantial evidence.

█ It follows that, pursuant to its review of the administrative record, the district court should have granted summary judgment for the government because the mortgagors had violated the terms of the contract by abandoning the premises and not making payments.

Accordingly, the order of the district court will be vacated insofar as it required compliance with Pennsylvania Acts 6 and 91. The case will be remanded to the district court for entry of summary judgment in favor of the United States.

SLOVITER, Circuit Judge, concurring and dissenting.

I agree with the majority that the district court's order remanding the government's action to the FmHA to require it to comply with the notice requirements under Pennsylvania law is an appealable order. *See AJA Assocs. v. Army Corps of Engineers,* 817 F.2d 1070, 1073 (3d Cir.1987). I also agree fully with its disposition of the government's appeal. Thus I join in the introduction, Part IA and Part II of the majority's opinion, and in its judgment reversing the court's order.

I dissent from the majority's assumption of jurisdiction over the portion of the district court's order that denied Rivera's motion for summary judgment. Our precedent makes clear that Rivera's appeal from the denial of summary judgment in her favor is an appeal from a nonfinal and nonappealable order. I fear that the majority's decision to yield to expediency in this case and its adoption of a discretionary standard of appellate jurisdiction over collateral matters will be improvident in the long run, consigning this court to a plethora of disputations over where the line should be drawn in future appeals.

In this court's in banc decision in *Kershner v. Mazurkiewicz,* 670 F.2d 440 (3d Cir. 1982), we canvassed the different positions taken in our prior cases and in other circuits on the doctrine of pendent appellate jurisdiction, and we opted for a circumscribed rather than broad approach to such jurisdiction. We held that the doctrine of pendent jurisdiction did not apply where two issues arising from a lower court order were "separate and distinct," rather than "'inextricably bound.'" *Id.* at 450 (quoting C. Wright, *Law of Federal Courts* § 102, at 513 (3d ed. 1976)). We held we had jurisdiction over the otherwise unreviewable portion of a district court order only if we could not properly decide the reviewable portion of the order without reference to the unreviewable issues. *Id.* at 449. If the reviewable portion of the order could be disposed of without venturing into unreviewable matters, this court's "jurisdiction should be limited accordingly," *id.;* thus, "a mere nexus between the two orders is not sufficient to justify a

decision to assume jurisdiction." *Id.* at 449–50; *see also NLRB v. Interstate Dress Carriers, Inc.*, 610 F.2d 99, 104 (3d Cir. 1979) (declining to review discovery order granted in conjunction with preliminary injunction).

Applying these principles in *Kershner*, we held that although we had jurisdiction under 28 U.S.C. § 1292(a)(1) of an appeal by prison inmates from the district court's denial of their motion for a preliminary injunction in a section 1983 suit, we lacked jurisdiction to consider the inmates' appeal from that portion of the district court's order that denied them class certification.

The majority attempts to distinguish *Kershner* from the instant case on the ground that the appeal in *Kershner* was in the preliminary injunction context, and therefore opportunity for appellate review would be ultimately provided. However, here as well the opportunity for appellate review is not foreclosed if we refrain at this stage from accepting jurisdiction over the denial of Rivera's summary judgment motion; if we do not reach Rivera's issues now, the majority concedes, "Ms. Rivera will again appeal." Maj. op. at 288.

Moreover, the majority's limitation of *Kershner* to the preliminary injunction context overlooks the important policy considerations that underlay that decision and that are equally applicable here. In *Kershner*, we emphasized that provisions for interlocutory appeal in section 1292 constituted exceptions "from the basic rule that interlocutory orders are not appealable," 670 F.2d at 448, and we stated that the scope of such exceptions must be construed with "great care and circumspection ... 'lest a floodgate be opened' " bringing in many otherwise unreviewable nonfinal orders. *Id.* at 447 (quoting *Switzerland Cheese Assoc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 24, 87 S.Ct. 193, 195, 17 L.Ed. 2d 123 (1966)).

In any event, this court has not viewed *Kershner* as necessarily confined to the preliminary injunction context. *See Miller v. Bolger*, 802 F.2d 660, 667 n. 7 (3d Cir. 1986) (suggesting that the *Kershner* analysis requiring the issues to be "inextricably

bound" could also be applicable in an interlocutory appeal under 28 U.S.C. § 1292(b)).

Finally, I cannot agree with the majority's assertion that this situation is akin to *Johnson v. Alldredge*, 488 F.2d 820 (3d Cir.1973), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). Even if *Johnson* were more expansive than *Kershner*, and it is not, *Kershner*, as the later in banc decision, would control. In *Johnson*, which involved an appeal certified under 28 U.S.C. § 1292(b), we held we were not limited to the inartful wording of the controlling question in the district court's certification order. *Id.* at 822–23. We did not expand the appeal beyond the legal issue involved in the order appropriately before us there.

I am concerned that the majority's decision in this case takes a step towards opening the floodgates we sought to keep closed in *Kershner*. The issues in the government's appeal and Rivera's appeal are not "inextricably intertwined," as required under *Kershner*. That they are distinct is demonstrated by the independent treatment given them in the majority's opinion. *See Tustin v. Heckler*, 749 F.2d 1055, 1065–66 (3d Cir.1984) (*Kershner* bars court from reviewing class certification order along with preliminary injunction, even though court would like to do so, because court lacks jurisdiction when issues are "entirely separate"); *W.L. Gore & Assocs. v. Carlisle Corp.*, 529 F.2d 614, 618 (3d Cir.1976) ("jurisdiction conferred upon the court of appeals does not extend to other claims or issues determined by the judgment which have no bearing upon the propriety of the action of the court with respect to the [reviewable issue]").

The cases from other circuits on which the majority relies may take a more liberal approach toward assertion of pendent appellate jurisdiction than we adopted in *Kershner*. In any event, they are distinguishable from this case because they appear to hold only that where extensive overlap exists in the issues and facts relevant to reviewable and unreviewable portions of a lower court decision, an appellate

court may exercise discretion to consider otherwise unreviewable issues.

In *San Filippo v. United States Trust Co.*, 737 F.2d 246 (2d Cir.1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985), the court first found that it had jurisdiction under the collateral order doctrine to review the district court's orders denying summary judgment and requiring defendants to be deposed because both orders were premised on a rejection of defendants' claim of absolute immunity. The court then proceeded to consider another ground for defendants' summary judgment motion in light of the "overlap" in the factors relevant to the nonappealable and the appealable issues. *Id.* at 255; *see also Barrett v. United States*, 798 F.2d 565, 570–71 (2d Cir.1986) (on appeal from denial of qualified and absolute immunity to certain defendants, court accepted pendent jurisdiction of plaintiff's cross-appeal of an independently unreviewable order granting absolute immunity to another defendant because all of the issues involved in the cross-appeal were also involved in the appeal of the collateral final order); *cf. New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 760 (2d Cir.1977) (declining to review denial of summary judgment in course of appeal of interlocutory order on ground that expanded review would require additional expenditure of effort).

In *Consolidation Coal Co. v. Local 1702*, 683 F.2d 827, 831 (4th Cir.1982), where the court decided that "in the interests of efficiency" it would hear the interlocutory appeal of a union from the contempt order against it together with the appropriate appeal of the individual union officials, it is evident that the issues on the two appeals coincided.

In the final case cited by the majority, *Intermedics Infusaid, Inc. v. Regents of Univ. of Minnesota*, 804 F.2d 129, 134 (Fed.Cir.1986), the court expressly stated that it would exercise pendent appellate jurisdiction over the appeal of a district court's grant of a stay after accepting jurisdiction over another appealable interlocutory order, "because the two motions are closely interrelated factually and, indeed, are interdependent."

Thus, even were we free to depart from *Kershner's* restrictive requirement of "inextricabl[e]" connection between the appealable and nonappealable orders for assumption of pendent appellate jurisdiction, 670 F.2d at 449, the majority today in asserting jurisdiction over a wholly distinct issue surpasses even the more liberal requirements for assertion of pendent appellate jurisdiction of these other circuits.

There may be valid policy reasons to permit a court of appeals to assume jurisdiction over an appeal such as Rivera's. We cannot avoid taking cognizance of the waste of judicial resources that will occur if we require Rivera to again bring an appeal after our remand to the district court produces a preordained result. However, the exercise of discretionary pendent jurisdiction simply because the result on remand and issues to be raised on subsequent appeal can be foreseen represents a significant alteration of our traditionally restrained approach to the exercise of jurisdiction.

More important, the majority establishes no workable guideline beyond that of referring to our need to exercise our discretion "sparingly." Maj. op. at 287. As the court stated in *Garner v. Wolfinbarger*, 433 F.2d 117, 120 (5th Cir.1970): "[t]he ad hoc approach [to pendent jurisdiction] invites the parties to inject a sham issue as the vehicle to bring the case to this court at the interlocutory stage for a declaration on an order not otherwise reviewable [and] confuses the courts and the parties, who assume that because a discretionary ... order has been reviewed in one case it can be reviewed in any other." The majority's contention that no such danger is present in the instant case because a cross-appeal is here involved does not explain how this court is to avoid creating expectations that future litigants may be the beneficiaries of similar exercises of discretionary jurisdiction.

In the last analysis, the majority has made policy decisions that are more appropriately those of Congress. That body has

the responsibility of fine-tuning our jurisdiction and may very well adopt a rule that gives us discretion to assume jurisdiction when efficient to do so. Until Congress acts, and because our precedent is to the contrary, I believe we must dismiss Rivera's appeal. Accordingly, I respectfully dissent from part IIB of the majority opinion and would not reach Part III.