

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-5-2002

# Operating Sys v. Wang Lab Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 01-2700

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Operating Sys v. Wang Lab Inc" (2002). *2002 Decisions.* Paper 477.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/477

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 01-2700
_____

OPERATING SYSTEM SUPPORT, INC.,
a Florida corporation

v.

WANG LABORATORIES, INC.,
a Delaware corporation;
BULL HN INFORMATION SYSTEMS, INC.,
a Delaware corporation;
BULL INFORMATION SYSTEMS, LIMITED;
BULL WORLDWIDE INFORMATION SYSTEMS, LTD.

Wang Laboratories, Inc., n/k/a
Getronics Wang Co. LLC,

Appellant

_____

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 98-cv-02138)
District Judge: Honorable Dickinson R. Debevoise
_____

Argued
March 7, 2002
Before: BECKER, Chief Judge, ALITO and RENDELL,
Circuit Judges.

(Filed August 5, 2002)

_____

## OPINION

_____

BECKER, <u>Chief Judge</u>.

This appeal involves a dispute between plaintiff Operating System Support, Inc., ("OSS") and defendant Wang Laboratories, Inc. ("Wang") over Wang's rights in a piece of computer software known as the Ult-Plus operating system. Ult-Plus was created by Allerion, Inc., and is a derivative of the Pick Operating System ("Pick OS"), which Pick Systems, Inc. ("Pick") developed and owns. Through a complex series of licensing agreements and assignments, OSS claims a contractual right to exclude Wang from sublicensing Ult-Plus. In addition to alleging breach of contract, OSS also claims that Wang's use of Ult-Plus infringes OSS's copyright in Ult-Plus and constitutes unfair competition.

Wang appeals from the order of the District Court granting OSS a preliminary injunction, granting OSS partial summary judgment, and denying Wang's cross-motion for summary judgment. The District Court's grant of partial summary judgment declared that "Wang does not have the right to sublicense Ult-Plus or disclose the source code of the Pick Operating System." A.26. Accordingly, the District Court enjoined Wang from "sublicensing Ult-Plus or otherwise disclosing the source code of the Pick Operating System."

We conclude that the District Court's analysis of the relevant contractual provisions was erroneous, and that Wang has a contractual right both to sublicense Ult-Plus in object

2

code form and to use the Ult-Plus source code and Pick OS source code to perform software support for customers.  Accordingly, we will reverse the District Court's order granting OSS a preliminary injunction and partial summary judgment, and denying Wang's cross-motion for summary judgment, and remand for further proceedings consistent with this opinion.

## I.  Facts and Procedural History

Ult-Plus is a derivative of the Pick OS, which was created by Pick, who continues to own the Pick OS.  A.5.  Pursuant to various licensing agreements between Pick and Allerion (collectively the "Pick-Allerion" agreement), Allerion developed Ult-Plus.  A.147-291.[1] These agreements prohibited Allerion from disclosing the Pick OS source code to any third party, and permitted Allerion to license its derivatives of the Pick OS in object code form only.   It is important to note in this regard that computer programmers initially write software in what is known as "source code," which consists of a set of instructions in some programming language such as C++ or Visual Basic.  A computer programmer who has access to software's source code can understand how the software works.  Access to the source code is thus necessary to modify how the software operates, for example, to eliminate a "bug" or to add extra functionality to the software.  Before a computer can

---

[1] At the time it developed Ult-Plus, Allerion's name was "The Ultimate Corporation." Like the parties and the District Court, we will refer to Allerion by its current name, even when referring to it at a time when it was the Ultimate Corporation.
Allerion created two separate operating systems – the Ultimate Operating System, and its derivative, Ult-Plus.  For convenience, we will refer to both operating systems collectively as Ult-Plus.

3

actually execute the software, however, the source code form of the software must be translated, usually via a computer program known as a "compiler," into object code. The object code version of a program, unlike the source code version, is directly executable by a computer, but generally unintelligible to humans. *See Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1230-31 (3d Cir. 1986); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1243 (3d Cir. 1983); Note, *Copyright Protection of Computer Program Object Code*, 96 Harv. L. Rev. 1723, 1724-25 (1983).

Allerion eventually sold its entire Customer Service Division, including its contracts for support and maintenance of Ult-Plus customers, to Bull HN Information Systems, Inc. ("Bull"), which is a defendant in this lawsuit but not a party to this appeal. A.293. Under the terms of the sale, which we will refer to as the "Allerion-Bull" agreement, Allerion granted Bull a nonexclusive license to use Ult-Plus, including the right to use the source code of Ult-Plus to perform software support for customers. A.294. The agreement also granted Bull "the right to grant sublicenses to CUSTOMERS worldwide to utilize, modify, and copy the LICENSED PRODUCTS, in object code form only." A.294. The contract defined "CUSTOMER" as "an end-user or prospective end-user of data processing products which utilize the Ultimate Operating system," and defined "LICENSED PRODUCTS" to include Ult-Plus and the Pick OS. A.293-94.

On the same day that Allerion and Bull entered this agreement, Pick and Bull also entered an agreement (the "Pick-Bull" agreement), whereby Pick granted Bull a non-exclusive license to use the Pick OS and Ult-Plus. Under the contract, Bull obtained "the

4

right to grant sublicenses to CUSTOMERS worldwide to utilize and copy for archival purposes the LICENSED PRODUCTS, in object form only." A.301. The agreement, however, limited Bull's rights in the Ult-Plus and Pick OS source code, stating that "the license to use source code is limited to the right to have and use source code to the LICENSED PRODUCTS to perform software support for Customers, and to develop and use CHANGES to the LICENSED PRODUCTS." A.301.

Both the Allerion-Bull and the Pick-Bull agreements provided that they would enure "to the benefit of the assignee of the entire assets of either PARTY to which [the] Agreement relates." A.297, 303. The Agreements stated, however, that they "shall not otherwise be assignable without the prior written consent of the other PARTY." A.303. The agreements further provided that in the event of "any termination" of the agreements, "[a]ll sublicenses granted to CUSTOMERS . . . shall survive" and that "BULL shall continue to have those rights and licenses . . . which are reasonably necessary for BULL to fulfill obligations to CUSTOMERS under contracts entered into up to and including the date of such termination . . . ." A.296, 302.

In January 1995, Wang purchased Bull's entire customer service operations and business in the United States, including Bull's rights under the Pick-Bull and Allerion-Bull agreements. A.452-633. We will refer to this sale as the "Bull-Wang" agreement. By this time, Allerion had filed for bankruptcy, and in an assignment executed on March 23, 1995, which we will refer to as the "Allerion-Pick" agreement, Allerion conveyed to Pick its ownership of Ult-Plus and its interest in the licenses that Pick had earlier granted Allerion

5

under the Pick-Allerion agreement. A.306-08. This assignment provided that "nothing herein shall be deemed to modify or extinguish the rights of any third party licensee of Allerion," and was made subject to the approval of the Bankruptcy Court. A.307. On June 12, 1995, the Bankruptcy Court, pursuant to 11 U.S.C. § 363(f), approved the assignment "free and clear of any and all liens, claims and encumbrances, with valid liens, claims and encumbrances to attach to the proceeds of sales in the same priority as presently exists against the License . . . ." A.833.

On March 27, 1995, Pick and OSS, the plaintiff in this case, entered a software distribution agreement, which provided that "PICK has recently acquired the rights to the Ultimate and Ultimate Plus software products. Distributor [OSS] shall be given exclusive rights to market these products through its resellers." A.892. Following this agreement, OSS and Wang began to dispute Wang's rights in Ult-Plus, and in September, 1995, entered a reseller agreement (the "OSS-Wang" agreement), under which OSS authorized Wang to sublicense Ult-Plus to end-users and Wang agreed to pay license fees to OSS. A.361-78. The Agreement provided that

> Both Reseller [Wang] and OSS understand that this Agreement has been entered into while Reseller and OSS disagree as to what legal rights, if any, Reseller has pursuant to other agreements between parties who are not a party to this Agreement. Both OSS and Reseller agree that entering into this Agreement does not modify or diminish any rights of Reseller under other agreements and this Agreement shall in no event constitute a waiver of any such rights under those Agreements.

A.375-76.

OSS contends that in December 1996, pursuant to a settlement agreement in *OSS,*

6

*Inc. v. Pick Systems*, CV 96-6436-DDP (CWx), in the Central District of California, Pick

assigned to OSS all its rights in Ult-Plus. A transcript of the settlement proceedings shows

that OSS's counsel enumerated, as one of the terms of the settlement agreement, that

> Pick Systems will transfer to OSS all of its rights, title and interest to the
> Ult-Plus and Ultimate products except that the underlying Pick Systems will
> be given to OSS by Pick Systems pursuant to a source code confidentiality
> agreement that will be a perpetual license.

A.420.

Maximo Rosa, a shareholder of OSS, testified at his deposition that shortly after

OSS's settlement with Pick, "I transferred the Ult-Plus product from OSS to OSS

Holdings." A.389. Rosa further testified that OSS and OSS Holdings are two separate

corporations and that "OSS Holdings is the company that owns the Ult-Plus product."

A.388-89. In a certification submitted to the District Court, however, Rosa stated:

> I have read my deposition transcript wherein I indicate that OSS transferred
> the right, title and interest in Ult-Plus to OSS Holdings, Inc. I executed an
> assignment from OSS to OSS Holdings, Inc. The assignment has been and is
> subject to Pick Systems' approval. Pick Systems has not consented to the
> assignment at this time. At this time, the ownership of Ult-Plus remains with
> OSS and has not been delivered to OSS Holdings, Inc. Once Pick Systems
> grants its consent, OSS will deliver the right, title and interest in Ult-Plus to
> OSS Holdings, Inc.

A.989-90.

On October 17, 1997, OSS gave Wang notice that it was terminating the Pick-Bull

agreement, which Pick had earlier purported to terminate on May 17, 1995, because of

Bull's alleged default on the payment of royalties and Wang's breach of the agreement by

selling new licenses to Ult-Plus. A.733-34, 877. OSS subsequently filed this lawsuit

7

against Wang, seeking an injunction prohibiting Wang from using Ult-Plus, a declaratory judgment of OSS's exclusive rights in Ult-Plus, and compensatory damages. OSS's initial complaint included claims for breach of contract and unfair competition, and a variety of other state and federal claims. OSS later amended its complaint to include a copyright infringement claim as well.

On the parties' cross-motions for summary judgment, the District Court granted Wang summary judgment on all of OSS's claims except its claims for breach of contract, unfair competition, and copyright infringement. The Court granted OSS partial summary judgment, declaring that "Wang does not have the right to sublicense Ult-Plus or disclose the source code of the Pick Operating System." A.26. The same order also granted OSS's motion for a preliminary injunction, and enjoined Wang from "sublicensing Ult-Plus or otherwise disclosing the source code of the Pick Operating System." A.26. The District Court later stayed its earlier order "to the extent that it prohibits Wang from creating or issuing replacement licenses to those of its current customers experiencing a hardware failure to whom Wang is contractually obligated to provide support and maintenance services." A.33.

## II. Jurisdiction, Standard of Review, and Standing

### A. Jurisdiction

Wang appeals from the District Court's order granting OSS's motion for a preliminary injunction, granting OSS partial summary judgment, and denying Wang's motion for summary judgment on OSS's contract, unfair competition, and copyright

8

infringement claims.  The District Court had subject matter jurisdiction pursuant to 28

U.S.C. § 1332(a)(1), and we have appellate jurisdiction pursuant 28 U.S.C. § 1292(a)(1),

which authorizes  "appeals from . . . [i]nterlocutory orders of the district courts . . .

granting, continuing, modifying, refusing or dissolving injunctions . . . except where a direct

review may be had in the Supreme Court . . . ."  We have jurisdiction to review the District

Court's disposition of the parties' cross-motions for summary judgment only to the extent

permitted by the doctrine of pendent appellate jurisdiction:

> If the preliminary injunction issue appealable under section 1292(a)(1)
> cannot be resolved without reference to the otherwise nonappealable . . .
> issue – either because the latter issue directly controls disposition of the
> former, or because the issues are, in some other way, inextricably bound –
> then both issues must be addressed in order to resolve properly the section
> 1292(a)(1) preliminary injunction issue. . . .  If, on the other hand, the
> appellate court can dispose of the section 1292(a)(1) appeal without
> venturing into otherwise nonreviewable matters, its jurisdiction should be
> limited accordingly.

*Kershner v. Mazurkiewicz*, 670 F.2d 440, 449 (3d Cir. 1982) (en banc) (internal footnotes

and emphases omitted).

## B.  Standard of Review

"We review a district court's order granting a preliminary injunction for abuse of

discretion, its factual findings for clear error, and its determinations of questions of law de

novo."  *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).  "A

preliminary injunction is an extraordinary remedy that should be granted only if (1) the

plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the

plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and

9

(4) granting the injunction is in the public interest." *Id.* For purposes of this appeal, Wang challenges only OSS's likelihood of success on the merits, and does not question the trial court's decision with respect to other components of the preliminary injunction equation: the balance of hardships, irreparability, and public interest concerns. *See* Blue Br. at 30 n.10.

We review the District Court's disposition of the parties' cross-motions for summary judgment de novo. *See Woodside v. School Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001). Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### C. Standing

Wang argues that since OSS assigned whatever rights it had in Ult-Plus to OSS Holdings, a separate corporation who is not a party to this lawsuit, OSS lacks standing to bring this suit. Wang relies on the deposition testimony of Maximo Rosa, a shareholder of OSS, who stated that shortly after OSS's settlement with Pick, "I transferred the Ult-Plus product from OSS to OSS Holdings." A.389. Rosa further testified that OSS and OSS Holdings are two separate corporations and that "OSS Holdings is the company that owns

10

the Ult-Plus product." A.388.

In response, OSS points to a certification submitted to the District Court, in which Rosa stated:

> I have read my deposition transcript wherein I indicate that OSS transferred the right, title and interest in Ult-Plus to OSS Holdings, Inc. I executed an assignment from OSS to OSS Holdings, Inc. The assignment has been and is subject to Pick Systems' approval. Pick Systems has not consented to the assignment at this time. At this time, the ownership of Ult-Plus remains with OSS and has not been delivered to OSS Holdings, Inc. Once Pick Systems grants its consent, OSS will deliver the right, title and interest in Ult-Plus to OSS Holdings, Inc.

A.989-90. Wang rejoins that Rosa's certification may not be relied on because it is inadmissible as legal argument and hearsay, and contradicts his deposition testimony. *See Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) ("When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists.").

Assuming without deciding that Wang is correct that Rosa's certification may not be relied on, we believe that a genuine issue of material fact exists as to whether OSS has standing, or whether it has divested itself of any interest it had in Ult-Plus by transferring that interest to OSS Holdings. The record is clear that Pick conveyed to OSS an interest in Ult-Plus. In particular, the distributor agreement between Pick and OSS provided: "PICK has recently acquired the rights to the Ultimate and Ultimate Plus software products. Distributor [OSS] shall be given exclusive rights to market these products through its

11

resellers." A.892. Additionally, the transcript of a proceeding in a lawsuit between Pick and OSS in which the parties put a settlement agreement on the record, includes a description of one provision of the settlement agreement: "Pick Systems will transfer to OSS all of its rights, title and interest to the Ult-Plus and Ultimate products . . . ." A.420.

Although Rosa's deposition testimony is evidence that OSS has divested itself of any interest in Ult-Plus, its probative value is insufficient to create any more than a triable issue of fact on that issue. Rosa's statements that "OSS Holdings . . . owns the Ult-Plus product," and that "I transferred the Ult-Plus product from OSS to OSS Holdings," A.388-389, are conclusory legal assertions unsupported by any documentary evidence or any specific details as to how the transfer occurred. Indeed, when pressed, Rosa was unable to explain the basis for his conclusion that OSS had divested itself of its interest in Ult-Plus. During his deposition, Rosa was asked "Are you aware of any assignment document or any legal document that makes that transfer effective, the one between OSS Inc. and OSS Holdings?" Rosa responded, "I would have to defer to Fred Biehl [OSS's attorney] because he was the one who did it." A.390.

As an unsubstantiated legal conclusion, Rosa's deposition testimony is not sufficiently probative to entitle Wang to summary judgment, as Wang contends. *See, e.g.*, *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) ("An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant's burden.") (internal quotation marks and citation omitted). Accordingly, we reject Wang's argument that no triable issue of fact exists as to whether OSS has divested itself of any interest in

12

Ult-Plus, and that the District Court improperly denied Wang's motion for summary judgment.

The existence of this triable issue of fact as to OSS's standing does not render improper the District Court's grant of partial summary judgment to OSS, since the District Court's order did not declare that OSS, as opposed to OSS Holdings, owns the disputed rights in Ult-Plus. Rather, the District Court's order granting partial summary judgment was limited to simply declaring that "Wang does not have the right to sublicense Ult-Plus or disclose the source code of the Pick Operating System." A.26.

Similarly, the existence of this triable issue of fact as to whether OSS has transferred its interest in Ult-Plus to OSS Holdings, and therefore lacks standing, does not require reversal of the preliminary injunction. In its opinion granting the preliminary injunction, the District Court determined that "if OSS lacked or lacks standing in the future, an appropriate amendment or restructuring of the case will permit resolution of the case on the merits." A.14. We do not believe that the District Court abused its discretion in deciding to grant the preliminary injunction on the assumption that the case could be restructured to include OSS Holdings if it turned out that OSS had in fact transferred any interest it had in Ult-Plus to OSS Holdings. At his deposition, Rosa testified that he was the sole shareholder of OSS, and when asked whether he "owns any other company," responded that "I'm part of OSS Holdings." A.388. Moreover, a June 29, 2000, letter from OSS's counsel to Pick's counsel discusses the "proposed stock distribution in Operating System Support, Inc.," which would have three shareholders, and states that "OSS Holdings,

Inc. would have the same stock distribution as OSS." A.976-77.

Although a triable issue of fact exists as to whether OSS has transferred its interest Ult-Plus to OSS Holdings, given this evidence that OSS and OSS Holdings are closely held corporations with overlapping shareholders, the District Court did not abuse its discretion in holding that case could be restructured to include OSS Holdings as a plaintiff, if necessary, and therefore that the existence of this question of fact did not pose an obstacle to the plaintiff's likelihood of success on the merits.

### III. Wang's Rights in Ult-Plus

In order to determine whether the District Court abused its discretion in entering a preliminary injunction against Wang and granting OSS partial summary judgment, we must analyze each conveyance in the chain of assignments and licensing agreements from Pick to Wang. In particular, we must determine whether, as the District Court declared in granting partial summary judgment to Wang, OSS has no right to sublicense Ult-Plus or to disclose the Pick OS source code. We will analyze the chain of assignments first to determine Wang's rights to sublicense Ult-Plus in object code form, and then to determine Wang's rights to disclose the Pick OS source code.

### A. Wang's Rights to License Ult-Plus in Object Code Form

### 1. Pick-Allerion Agreement

In analyzing Wang's rights to sublicense Ult-Plus, we begin with the Pick-Allerion agreement, the first agreement in the relevant series of conveyances. It is undisputed that through this agreement, Pick conveyed to Allerion the right to sublicense the Pick OS in

14

object code form to end-users and dealers, and to use the Pick OS source code to create derivatives of the Pick OS. A.156, 166. Pursuant to this agreement, Allerion developed Ult-Plus, the operating system at issue here.

## 2. Allerion-Bull Agreement

The next conveyance in the chain of agreements is the Allerion-Bull Agreement. The parties dispute the scope of the rights that Allerion conveyed to Bull under this Agreement. The District Court concluded that:

> By way of the Allerion-Bull Agreement, Allerion licensed Bull the right to develop enhancements and derivative products from the source code [of Ult-Plus], and the right to provide maintenance and support to end users [of Ult-Plus]. Allerion did not provide Bull with . . . the right to issue licenses to end users.

A.13. Wang argues that the District Court erred in holding that the Allerion-Bull agreement did not convey to Bull the right to license Ult-Plus to end users.

The Allerion-Bull agreement provided that "BULL shall have the right to grant sublicenses to CUSTOMERS worldwide to utilize, modify and copy the LICENSED PRODUCTS, in object form only." A.294. The Allerion-Bull agreement defined LICENSED PRODUCTS to include "all COMPUTER PROGRAM(S) licensed to Allerion by Pick under the Allerion/Pick Agreements, together with any modifications or derivative works created at any time by Allerion, including all versions of the Ultimate Operating System." A.293-94. The contract defined CUSTOMER as "an end-user or a prospective end-user of data processing products which utilize the Ultimate Operating System." A.294. Thus, the Allerion-Bull agreement clearly authorized Bull to sublicense Ult-Plus to end

15

users, although the right was limited to sublicensing Ult-Plus in object code form.

OSS concedes that the Allerion-Bull agreement, by its own terms, purported to convey to Bull the right to license Ult-Plus in object code form. OSS argues, however, that this conveyance is invalid because it violates Pick's rights in the Pick OS source code, which Pick retained under the Pick-Allerion agreement. Wang responds that under the Pick-Bull agreement, which was entered into on the same day as the Allerion-Bull agreement, Pick expressly granted to Bull the right to license Ult-Plus in object code form. We therefore turn to the Pick-Bull agreement.

### 3. Pick-Bull Agreement

We agree with Wang that the Pick-Bull agreement clearly granted Bull the right to license Ult-Plus in object code form. The agreement provided that "BULL shall have the right to grant sublicenses to CUSTOMERS worldwide to utilize and copy for archival purposes the LICENSED PRODUCTS, in object code form only." A.301. The agreement defined "LICENSED PRODUCTS" to include "all versions of the ULTIMATE OPERATING SYSTEM" and defined "CUSTOMER" to mean "an end-user or a prospective end-user of data processing products which utilize the Ultimate Operating System." A.300-301. Both Allerion and Pick, therefore, conveyed to Bull, pursuant to the Allerion-Bull and Pick-Bull agreements respectively, the right to license Ult-Plus to end users in object code form.

OSS argues that under the Pick-Bull agreement, Bull had no right to license Ult-Plus in object code form, because the exercise of such a right would violate Pick's rights in the Ult-Plus source code. OSS's argument proceeds from "the premise that in order to issue a

16

license in object code form, you must have access to the underlying source code to allow the program to operate." Red Br. at 12. This argument, however, would render nugatory the provision in the Pick-Bull agreement, quoted above, whereby Pick expressly granted Bull the right to sublicense Ult Plus in object code form. Moreover, there is no evidence in the record to support OSS's assertion that it is impossible to license Ult-Plus in object code form without accessing the underlying source code. Finally, even if OSS were correct that "in order to issue a license in object code form, you must have access to the underlying source code to allow the program to operate," Red Br. at 12, the Pick-Bull agreement clearly conveyed to Bull such a right, since Pick granted Bull "the right to have and use source code to the LICENSED PRODUCTS to perform software support for Customers." A.301.

OSS alternatively argues that the Pick-Bull agreement conveyed to Bull the right to license Ult-Plus only for use for archival purposes. In particular, OSS reads the clause "for archival purposes" as modifying both the verb "utilize" and the verb "copy," in the provision of the Pick-Bull agreement granting Bull "the right to grant sublicenses to CUSTOMERS worldwide to utilize and copy for archival purposes the LICENSED PRODUCTS, in object code form only." A.301.

We conclude that the phrase "for archival purposes" modifies only the verb "copy," not the verb "utilize." Under the Copyright Act, the phrase "copy for archival purposes" has established meaning with reference to computer programs: to make a backup copy to guard against the risk of damage to or destruction of the original caused by mechanical or

17

electrical failure.  *See* 17 U.S.C. § 117(a)(2) ("[I]t is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided . . . that such new copy or adaptation is for archival purposes only . . . ."); *Atari, Inc. v. JS&A Group, Inc.*, 597 F. Supp. 5 (N.D. Ill. 1983). Thus, the Pick-Bull agreement granted Bull the right to license customers to both use the Ult-Plus object code and make a backup copy of Ult-Plus object code in case the original was destroyed.

### 4.  Bull-Wang Agreement

Having determined that Bull possessed the right to license Ult-Plus in object code form, we turn to whether Bull validly assigned this right to Wang, pursuant to the Bull-Wang agreement.  The District Court concluded that Bull's assignment of the Pick-Bull agreement to Wang was invalid because it required Pick's consent, which the parties had not obtained.  *See* A.16.  The District Court relied on Section 9.1 of the Pick-Bull agreement, which provided that: "This Agreement shall be binding upon and enure . . . to the benefit of the assignee of the entire assets of either PARTY to which this Agreement relates.  This Agreement shall not otherwise be assignable without the prior written consent of the other PARTY."  A.303.

Wang contends that Pick's consent to Bull's assignment of the Pick-Bull agreement to Wang was not required, since Wang became the "assignee of the entire assets" of Bull to which the Pick-Bull Agreement related.  In particular, under the Bull-Wang agreement, Wang acquired Bull's "entire right, title and interest in all of the assets, properties, rights,

18

privileges, franchises, operations and business of [Bull's] customer services operations and business in the United States," A.462, which included all its assets relating to Ult-Plus. A.435-36, 639-45, 350-51. This evidence is undisputed, and OSS does not attempt to defend the District Court's determination that Bull's assignment of the Pick-Bull agreement to Wang violated the assignability provision of the Pick-Bull agreement.

We therefore conclude that there is no genuine issue of material fact with respect to the validity of the Bull-Wang assignment, and accordingly conclude that Bull conveyed to Wang the right to license Ult-Plus in object code form. Having determined that Bull's assignment of the Pick-Bull agreement to Wang did not breach the terms of the Pick-Bull agreement's assignability provision, we need not reach Wang's alternative arguments that even if Bull breached the terms of the Pick-Bull agreement by assigning its interest in the agreement to Wang, the Bull-Wang assignment is nonetheless valid because: (1) Pick waived its right to consent to Bull's assignment of the Pick-Bull agreement to Wang; and (2) a breach of the assignability provision of the Pick-Bull agreement would render only the assignor (Bull), not the assignee (Wang), liable for damages.

### 5. Allerion-Pick Bankruptcy Sale

The District Court determined that even if Wang possessed the right to sublicense Ult-Plus in object code form, its rights in Ult-Plus were terminated when Allerion conveyed to Pick its interest in Ult-Plus during the Allerion bankruptcy proceeding. In particular, the District Court held that as a result of the Allerion-Pick conveyance, "Pick regained sole possession of its proprietary information (the source code for the Pick

19

Operating System), as well as the derivative products developed by Allerion (the various versions of the Ultimate Operating System and/or Ult-Plus)." A.9.

Wang submits that the District Court erred in failing to give effect to the express terms of the Allerion-Pick conveyance, under which "Allerion hereby assigns and grants to Pick all rights, title and interest it now has in the License agreement and the Ult-Plus product. Provided however that nothing herein shall be deemed to modify or extinguish the rights of any third party licensees of Allerion." A.307. According to Wang, this proviso clearly preserved Wang's rights, as a third party licensee of Allerion.

OSS responds that the Allerion-Pick agreement was expressly made subject to "approval of the Bankruptcy Court," A.308, and that pursuant to 11 U.S.C. § 363(f), the Bankruptcy Court approved the sale to Pick of Allerion's interest in Ult-Plus "free and clear of any and all liens, claims and encumbrances, with valid liens, claims and encumbrances to attach to the proceeds of sales in the same priority as presently exists against the License . . . ." A.833.

We conclude that the Bankruptcy Court's free and clear sale did not extinguish Wang's rights in Ult-Plus, since a sale under § 363(f) does not affect the rights of contracting parties, who have no interest in property, as such. See FolgerAdam Security, Inc. v. Dematteis/MacGregor, JV, 209 F.3d 252, 261 (3d Cir. 2000).

### 6. OSS-Wang Reseller Agreement

In holding that Wang lacked the right to license Ult-Plus in object code form, the District Court relied on the OSS-Wang reseller agreement, which authorized Wang to

20

sublicense Ult-Plus in exchange for royalties. The District Court stated that "Wang's recognition of its limited position was evidenced by its entry into the Reseller Agreement with OSS which permitted it for a fee to issue sublicenses for Ult-Plus to its customers." A.15.

The OSS-Wang reseller agreement, however, expressly reserved whatever rights both parties possessed prior to entering the agreement. In particular, Section 12.8 of the agreement provided:

> Both Reseller [Wang] and OSS understand that this Agreement has been entered into while Reseller and OSS disagree as to what legal rights, if any, Reseller has pursuant to other agreements between parties who are not a party to this Agreement. Both OSS and Reseller agree that entering into this Agreement does not modify or diminish any rights of Reseller under other agreements and this Agreement shall in no event constitute a waiver of any such rights under those Agreements.

A.375-76. Thus, whatever rights Wang possessed in Ult-Plus pursuant to the chain of assignments and licenses from Pick to Allerion to Bull to Wang are preserved by the OSS-Wang reseller agreement.

### 7. Summary

We therefore hold that through the series of relevant agreements, Wang obtained a contractual right to license Ult-Plus in object code form to end-users.[2] We must next turn

---

[2] OSS suggests that whatever rights Wang had in Ult-Plus were extinguished when Pick allegedly terminated the Pick-Bull agreement on May 17, 1995, and when OSS purported to confirm this termination on October 17, 1997. A.733-43, 877. We do not reach this argument on appeal, since Wang failed to raise it before the District Court. *See Bell Atlantic-Pennsylvania, Inc. v. Pa. Pub. Util. Comm'n*, 273 F.3d 337, 344 n.3 (3d Cir. 2001) ("Our general practice is not to address legal issues not raised below, absent

21

to Wang's rights in the Ult-Plus and Pick OS source code.

### B. Wang's Rights in the Ult-Plus and Pick OS Source Code

In addition to enjoining Wang from sublicensing Ult-Plus in object code form, the District Court enjoined Wang from "disclosing the source code of the Pick Operating System."[3] A.26. The District Court's order granting partial summary judgment to OSS similarly declared that "Wang does not have the right to . . . disclose the source code of the Pick Operating System." A.26. Wang argues that the District Court erred in concluding that it lacked any right to disclose the Pick OS source code.

In Wang's submission, the Pick-Bull agreement granted Bull (and in turn Wang, as assignee of the Pick-Bull agreement) the right to disclose the Pick OS source code. Wang relies on Section 3.1 of the Pick-Bull agreement, which provides that "Pick hereby grants to BULL a non-exclusive, worldwide license under Pick's INTELLECTUAL PROPERTY RIGHTS to use the LICENSED PRODUCTS. Such license to use shall include the right to utilize, make CHANGES, copy, display, distribute, [and] demonstrate . . . the LICENSED PRODUCTS." A.301. Because the Pick-Bull agreement defines LICENSED PRODUCTS to include the "source code and object code forms" of Ult-Plus and the Pick OS, A.300-01, Wang argues that Section 3.1 granted Bull the right to "utilize," "copy," "distribute,"

---

exceptional circumstances.").

[3] The District Court later stayed the injunction "to the extent that it prohibits Wang from creating or issuing replacement licenses to those of its current customers experiencing a hardware failure to whom Wang is contractually obligated to provide support and maintenance services." A.33.

"display," and "demonstrate" the Pick OS source code. Blue Br. at 49, n.16.

Wang's argument, however, overlooks the next sentence of Section 3.1, which clearly limits Bull's rights in the Pick OS source code. In particular, Section 3.1 provides that "[t]he license to use source code is limited to the right to have and use source code to the LICENSED PRODUCTS to perform software support for Customers, and to develop and use CHANGES to the LICENSED PRODUCTS." A.301. We therefore conclude that Wang did not acquire, through the Bull-Wang agreement, the right to disclose the Pick OS and Ult-Plus source code, except insofar as the agreement conferred on Wang the right to use to source code to perform software support for customers.

## IV. Conclusion

In granting OSS a preliminary injunction, the District Court concluded that OSS was likely to succeed on its contract claim, and granted OSS partial summary judgment on that claim.[4] The District Court's decision to grant a preliminary injunction rested on an erroneous analysis of the contracts at issue. As explained above, Wang has a contractual right to license Ult-Plus in object code form and to use the Pick OS and Ult-Plus source code to perform software support for customers. It is therefore unlikely that OSS will succeed on the merits of its contract claim, and we will reverse the District Court's order

---

[4] With respect to OSS's copyright claim, the District Court concluded that "[a]lthough OSS's copyright claim appears to be a weak one, there are sufficient unanswered questions to preclude dismissing it at this point . . . ." A.22. Similarly, with respect to OSS's unfair competition claim, the District Court stated that "factual issues abound[,] and Wang's motion to dismiss that claim is denied." A.20.

23

granting OSS a preliminary injunction. For the same reasons, we will reverse the District Court's order granting OSS partial summary judgment and declaring that "Wang does not have the right to sublicense Ult-Plus or disclose the source code of the Pick Operating System." A.26.

Wang appeals not only from the District Court's order granting OSS a preliminary injunction and its order granting OSS partial summary judgment, but also from the District Court's order denying Wang's motion for summary judgment. Because the District Court's denial of Wang's summary judgment motion rested on an erroneous analysis of the relevant contracts, we will reverse the District Court's order denying Wang's summary judgment motion and remand for the District Court to determine whether Wang's contractual right to license Ult-Plus in object code form and to disclose the Pick OS and Ult-Plus source code to perform software support for customers provides Wang with a complete defense to OSS's contract, copyright, and unfair competition claims, thereby entitling Wang to summary judgment.[5]

---

[5] Wang submits that OSS's contract and unfair competition claims are preempted by the Copyright Act. To the extent that Wang's preemption argument provides an alternative ground for reversing the District Court's order granting OSS a preliminary injunction and partial summary judgment, we need not decide the question, since we will reverse these orders for the reasons discussed above. To the extent that Wang contends that its preemption argument entitles it to reversal of the District Court's interlocutory order denying Wang summary judgment on OSS's contract claim and unfair competition claim, we lack jurisdiction to decide the question, since it is not necessary for our review of the preliminary injunction. *See* 28 U.S.C. § 1292(a)(1) ("[T]he courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts . . . granting . . . injunctions . . . ."); *Kershner v. Mazurkiewicz*, 670 F.2d 440, 449 (3d Cir. 1982) (en banc) ("If . . . the appellate court can dispose of the section 1292(a)(1) appeal without venturing

24

---

To the Clerk:

      Please file the foregoing Opinion.

                                  BY THE COURT:

                                  /s/ Edward R. Becker
                                  Chief Judge

---

into otherwise nonreviewable matters, its jurisdiction should be limited accordingly."); *see also United States v. Spears*, 859 F.2d 284, 287 (3d Cir. 1988) (stating that the assumption of pendent appellate jurisdiction "is an exercise of discretion by a Court of Appeals and should be used sparingly"). We similarly decline to decide whether, as Wang argues, it is entitled to summary judgment on OSS's copyright claim because OSS failed to prove ownership as required by § 204(a) of the Copyright Act.